# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

MIA JONES,      )
      )
**Plaintiff,**      )
      )
**v.**      )      **Case No. 3:19-cv-0860**
      )      **Judge Aleta A. Trauger**
**INVASIX INC. and INMODE LTD.,**      )
      )
**Defendants.**      )
      )

## MEMORANDUM

Defendants Invasix Inc. ("Invasix") and InMode Ltd. ("InMode") have filed a Motion for Summary Judgment (Doc. No. 90), to which Mia Jones has filed a Response (Doc. No. 104), the defendants have filed a Reply (Doc. No. 111), Jones has filed a Sur-Reply (Doc. No. 115), and the defendants have filed a Sur-Sur-Reply (Doc. No. 118.) Jones has filed a Motion to Strike Summary Judgment Evidence and Objection (Doc. No. 101), to which the defendants have filed a Response (Doc. No. 110). For the reasons set out herein, the defendants' motion will be granted in part and denied in part, and Jones' motion will be denied.

## I. BACKGROUND

This case involves a medical device manufactured, marketed, and/or sold by the defendants under the name "Fractora." It is used on the skin for cosmetic purposes. A detailed account of the regulatory environment surrounding the sale and marketing of the Fractora as a medical device, combined with allegations, by Jones, of various instances of wrongdoing, can be found in the court's Memorandum of May 19, 2020. (Doc. No. 85 at 1–7.) In short, Jones alleges that the defendants marketed the Fractora improperly, including by encouraging its operation by

unqualified personnel and/or in unsafe ways, leading to the device's inflicting permanent injuries on some patients.

Jones—herself an aesthetician who was trained to perform Fractora procedures—alleges that she was injured by a Fractora procedure performed on her face by another aesthetician on November 15, 2017, likely due, at least in part, to the aesthetician's use of a "60-pin tip," rather than a weaker tip. On January 23, 2019, Jones and others with similar allegations entered into a Tolling Agreement with Invasix "and any other related and affiliated corporations and businesses" covering potential claims related to Fractora. On April 17, 2019, a day before the Tolling Agreement was to expire, Jones filed her claims in the U.S. District Court for the Central District of California, which later transferred the claims here. (Doc. No. 1; Doc. No. 76-4; Doc. No. 105 ¶¶ 1–2, 9.) At issue with regard to the current motion is whether those claims were timely filed, which, as the court will discuss later in this opinion, may depend, in part, on the details of when Jones became or should have become aware that she had suffered a wrongful injury, rather than the intentional, controlled physical damage inflicted during a successful Fractora procedure.

Jones concedes that the November 15, 2017 procedure immediately left her face "extremely red and a little swollen even after using a cooling device," which condition shortly thereafter transitioned to significant scabbing. (Doc. No. 105 ¶ 3.b, at 10 ¶¶ 26–7.[1]) She also concedes that her post-procedure condition was sufficiently severe that it caused her to miss three days of work. (Id. ¶ 3.c, at 10 ¶ 27.) Jones, moreover, was trained in the Fractora procedure herself and had had the Fractora procedure performed on her twice before—albeit with different

---

[1] For reasons that will be explained in this opinion, Jones' Response to the defendants' Statement of Undisputed Material Facts (Doc. No. 105) includes two numbered sets of paragraphs—the first, representing assertions by the defendants, and the second representing assertions by Jones. When the court cites this document, a citation to a paragraph without a page number will refer to the first set of numbered paragraphs. If a page number is included, the citation is to the second set of paragraphs.

2

parameters—and had had no such severe reaction. Therefore, she was at least aware that the Fractora procedure did not necessarily result in post-procedure disfigurement, temporary or otherwise. Those prior procedures, however, had not involved the 60-pin tip. (*Id.* ¶ 3.a, at 23 ¶ 46.) As time passed and Jones' face continued to show damage, she saw multiple physicians regarding the matter. She has also undergone corrective laser treatments and has spent money on medications, ointments, and other products in her attempts to address the problems that, she now believes, include scarring that may well be permanently disfiguring. (*Id.* ¶¶ 3.d–.f.)

Jones filed her April 17, 2019 Complaint with two co-plaintiffs, Heather Wanke and Janice Newman, in the Central District of California. (Doc. No. 1.) That Complaint named only Invasix as a defendant. (*Id.* at 1.) On June 28, 2019, Invasix filed a Motion to Sever and Transfer Plaintiffs' Claims. (Doc. No. 20.) Invasix noted that Jones and Wanke were Tennessee residents who had procedures performed on them in Tennessee, while Newman was a New York resident whose Fractora procedure was performed in New York. Moreover, Invasix argued, each plaintiff's claims involved unique questions regarding each patient's treatment, rendering joinder inappropriate. (Doc. No. 20-1 at 9.) The plaintiffs opposed the motion, arguing that their claims were based on the same course of wrongdoing by Invasix and that the Central District of California was the most convenient forum for key non-party witnesses. (Doc. No. 28 at 3, 14.) The court granted both of Invasix's requests, severing the plaintiffs' cases and transferring each case to the plaintiff's home district—that being, in Jones' case, the Middle District of Tennessee. (Doc. No. 36.)

On October 22, 2019, Jones filed an Amended Complaint adding InMode as a defendant. (Doc. No. 58 at 1.) On February 27, 2020, Invasix and InMode filed separate Motions to Dismiss, each of which alleged that Jones' claims were barred by the relevant statutes of limitations (and InMode's arguing, in addition, that service of process on that company, which is based in Israel,

3

was ineffective). (Doc. Nos. 67 & 69.) While those motions were pending, Jones filed a Motion for Leave to File Amended Complaint. (Doc. No. 73.) The proposed Second Amended Complaint included several new paragraphs under the heading "Facts Concerning Statute of Limitations," the first of which explained as follows:

> The Fractora procedure involves the intentional destruction of tissue so that new collagen will form, tightening and otherwise resurfacing the skin. All Fractora patients experience an injury and [patients] heal at different rates. The condition of Plaintiff's skin worsened over time after the procedure. Plaintiff only suspected she might have suffered an unintended injury with long term changes in her skin in early 2018. Subsequently, two physicians told Plaintiff she should not be alarmed, that she could expect her skin to continue healing for up to a year and that it would be impossible to determine whether she had any actual injury (as opposed to the intentional tissue damage and expected healing time for the Fractora) for at least a year after the procedure. A year's time confirmed that [Jones'] procedure caused an injury to her skin beyond that which is intended and she has suffered a cognizable injury caused by Defendants—permanent scarring, changes in skin texture and color and loss of volume. Thus, based on the advice of multiple [doctors], Plaintiff did not and could not through exercise of reasonable diligence [have] known she suffered a cognizable injury as a result of the Defendant's wrongful conduct until November 15, 2018.

(Doc. No. 87 ¶ 7.) The proposed Second Amended Complaint also excised or qualified certain details that could be construed as suggesting that she was aware of the nature of her injuries relatively early in the aftermath of her procedure. (*See* Doc. No. 105 ¶ 15.)

On May 19, 2020, the court entered a Memorandum and Order granting Jones leave to file the Second Amended Complaint. (Doc. Nos. 85–86.) In a footnote, the court noted that, despite the "complicated and at times challenging" choice-of-law questions potentially posed by the situation, neither party had, at that point, "suggest[ed] that any statute of limitations other than Tennessee's one-year limit should apply here." (Doc. No. 85 at 17 n.6.) The court therefore treated that issue as conceded for the purposes of the motions to dismiss and proceeded under Tennessee's one-year limitations period mandated for claims based on personal injury, Tenn. Code Ann. § 28-3-104(a)(1)(A), including product liability actions, Tenn. Code Ann. § 28-3-104(b). (*Id.*)

4

The court then considered the question of when to begin calculation of the one-year period under Tennessee's "discovery rule," which provides that a cause of action accrues "when the plaintiff knows or in the exercise of reasonable care and diligence should know that an injury has been sustained as a result of wrongful or tortious conduct by the defendant." *John Kohl & Co. v. Dearborn & Ewing*, 977 S.W.2d 528, 532 (Tenn. 1998) (citations omitted). The court noted that "[a]pplying the discovery rule to an injury caused by a medical procedure or treatment is often difficult, because medical intervention can involve significant pain and suffering even when no wrongfulness occurs." (Doc. No. 85 at 19.) That was particularly true here, the court observed, because "the very premise of her Fractora procedure [is], in a sense, to injure [the patient]—to inflict controlled, planned damage to [the patient's] tissue in order to cause a particular desired biological result." (*Id.*)

The court noted, however, that, even in the proposed Second Amended Complaint, there were substantial admissions that could be read to support an early accrual date for Jones' cause of action. (*Id.* at 21.) "Even with the amended language," the court wrote, "this case comes close to being one in which the court could take the unusual step of dismissing the claims rather than waiting for timeliness to be litigated on a summary judgment motion or at trial." (*Id.*) Nevertheless, the court ultimately concluded that the factual nature of the due diligence inquiry was sufficient to avoid outright dismissal or a conclusion that amendment would be futile:

> [E]ven if [Jones] knew that her reaction to the procedure had been far worse than most, she did not necessarily know that her bad reaction was something other than simply her having had the bad luck to fall on the far negative end of the spectrum of ordinary responses to an appropriately performed procedure. Jones now claims that she reasonably believed, based on representations to her by medical professionals, that she was merely having a difficult healing period. Based solely on the face of the proposed Second Amended Complaint, there is a possibility that Jones' claims did not accrue until as much as a year after her procedure—that is, on November 15, 2018.

(*Id.*) The court did, however, express "some concerns" about "[t]he issue of bad faith," in light of Jones' apparent attempt, through her amendment, to back away from admissions that she had already made in a signed pleading. (*Id.* at 22.) Nevertheless, the court allowed the amendment (albeit while requiring Jones to remedy a defect in the service of process on InMode that is now no longer at issue). (*Id.*)

On July 16, 2020, the defendants filed a Motion for Summary Judgment, again raising the issue of timeliness. (Doc. No. 90.) In support of their motion, the defendants rely both on facts admitted in the Second Amended Complaint and on facts alleged in her prior two Complaints. The defendants also rely on a letter, dated October 10, 2018, along with an accompanying packet of documents, sent from Jones' counsel to counsel for Invasix regarding Jones. (Doc. No. 94.) The letter—which consists of 13 pages of text, followed by over 100 pages of exhibits—details Jones' situation, including a section titled "Mia's Injuries," followed by a section titled "Invasix's Legal Responsibility." (*Id.* at 3–5.) The letter concludes as follows:

> It is our sincere hope this matter can be resolved quickly, amicably and privately. However, if we do not receive a substantive response to our demand of $500,000 within thirty (30) days, we will be forced to file suit and proceed in the public forum for resolving these types of disputes.
>
>                                 Sincerely,
>                                 Amy Davis
>                                 [Counsel for Jones]

(*Id.* at 13.)

The defendants provided an Affidavit by their counsel, Arthur J. Liederman, stating that he received the letter and accompanying materials on or around the letter's October 10, 2018 date. (Doc. No. 91-4 ¶ 3.) Liederman also draws the court's attention to emails and medical records provided by Jones' counsel as part of the packet, which document Jones' concerns about her

6

injuries and the steps she took to medically ameliorate her injuries as early as January 15, 2018. (*Id.* ¶¶ 8–13; Doc. No. 94 at 27–139.)

On July 27, 2020, Jones filed an Objection and Motion to Strike Summary Judgment Evidence. (Doc. No. 101.) Jones objects to the defendants' reliance on her superseded pleadings and the October 10, 2018 letter. She argues that the pleadings are hearsay, should not be attributed to Jones herself, and are without legal or factual import because they have been superseded. She argues that, because the letter was sent as part of a settlement demand, it is inadmissible for the purposes of establishing a contested issue of liability, including the timing of her discovery of her injury. (*Id.* at 1–2.)

On August 6, 2020, Jones filed her Response to the Motion for Summary Judgment. (Doc. No. 104.) The Response was accompanied by a Declaration by Jones. (Doc. No. 104-1.) Jones states that, when she first complained to her physician and employer, Dr. Paulino E. Goco, about the effects of her Fractora procedure, "he agreed [Jones'] skin's response was not ideal, [but] he could not say [her] experience was outside the expected results for the procedure. According to him, [Jones] could simply be on the far end of the spectrum in terms of the extent of the injury caused by the device and the progress of [her] healing." (*Id.* ¶ 3.) Jones continues:

> 4. On January 8, 2018, I saw Dr. Natalie Curcio for a second opinion. Dr. [Curcio] advised me to give my skin more time to heal, at least six months to a year after the procedure, as my skin would continue to heal and, before then, it would be impossible to assess whether I had suffered an injury beyond the therapeutic injury unintended by the procedure.
>
> 5. After my appointment with Dr. Curcio, on or about January 15, 2018, I discussed my situation with Wanda Cummings, an Invasix trainer. Cummings attributed the pinprick marks to the 60-pin tip selected for the procedure. Still, Cummings never suggested my healing was outside normal parameters. I asked, and neither she nor anyone else on behalf of Defendants reported my experience with the FDA as an adverse event. Cummings even suggested that I undergo . . . another Fractora procedure.

7

6. Cummings' statement that the 60-pin tip should not have been used for my procedure given [my] skin type was contrary to prior training provided to Dr. Goco and his staff, written instructions for use of the device previously provided to Dr. Goco and demonstrative instructional videos made available by Defendants. I assumed Cummings' remark referred to a new development in the instructions for use of the device and not an admission that the prior instructions for use were wrongful and rendered the device dangerous. In the days after her call with Cummings, I asked Dr. Goco if I could invite Cummings to the doctor's office to update the training and training materials; Dr. Goco agreed.

7. When I still had not seen improvement six months after the procedure, I sought a third opinion in April 2018 from Dr. William Stebbins. He was dismissive of the changes in [my] skin. He claimed he could hardly see what I was describing and advised me that it would be at least another six months before my skin had fully healed and an evaluation of potential unintended and persistent injury could be made.

8, None of the doctors I saw in the year after my procedure indicated my injuries could be due to wrongful conduct connected to the device or instructions for using the device.

(*Id.* ¶¶ 4–8.) Jones also states that her experience as an aesthetician "taught [her] that every person heals from these types of procedures at different rates and that many factors unique to the individual patient and his or her personal circumstances, such as health condition, can have a significant impact on healing times." (*Id.* ¶ 10.) Jones, however, does not dispute that she purchased laser treatment from Dr. Curcio around January 19, 2018 to address the damage to her skin, which is documented in the medical records that were provided as part of her settlement demand packet. (Doc. No. 105 ¶¶ 26–27.)

Consistently with this court's Local Rule 56.01(c), Jones filed a Response to the defendants' Statement of Undisputed Material Facts, in which she conceded or denied the facts alleged and reasserted her objections based on the admissibility of the underlying evidence. (Doc. No. 105.) The Local Rules provide that, when a party opposing a motion for summary judgment files a response to the movant's statement of undisputed material facts, the party may "contain a concise statement of any additional facts that the non-movant contends are material and as to which

the non-movant contends there exists a genuine issue to be tried." L.R. 56.01(c). Jones took advantage of that opportunity and asserted a lengthy collection of additional facts, supported by citation to the record, relevant to the issue of timeliness. (Doc. No. 105 at 16–25.)

When the non-moving party files a statement of additional undisputed facts, "the moving party must file a reply statement responding to each of the additional disputed facts . . . within fourteen (14) days of the filing of the response of the non-moving party." L.R. 56.01(d). The defendants, however, failed to comply with that requirement. It appears, from the briefing, that counsel for the defendants may have been unfamiliar with this aspect of the court's Local Rules.[2] Nevertheless, by failing to comply with the Local Rules, the defendants have conceded the asserted facts, although they will not necessarily be bound to any legal conclusions or mere characterizations included alongside the factual assertions themselves. L.R. 56.01(f).

Specifically, the defendants have not disputed the facts that Jones has asserted regarding what she was told by Dr. Goco and others, during her recovery, regarding the possibility that she was simply healing poorly from her procedure and might have been on the spectrum of ordinary responses to use of the Fractora device. (Doc. No. 105 at 20–22 ¶¶ 30–41.) The defendants also failed to dispute a number of facts regarding when Jones became aware of InMode's involvement in the production of the Fractora device. For example, Jones has established, for summary judgment purposes, that, in previous litigation against two Texas-based plaintiffs regarding the Fractora device, which began no later than 2015, "Invasix answered each lawsuit, specifically identifying itself as the 'manufacturer of such medical device.'" (*Id.* at 16 ¶¶ 1–4.) Counsel for Jones was also counsel for those Texas-based plaintiffs. The defendants have not disputed that

---

[2] The Defendants filed a Motion for Leave to Exceed the Page Limit and Time to File Reply, in which the defendants arguably appeared to believe that they would need to rely solely on their reply brief to respond to Jones' factual assertions, when, in fact, they not only could have, but were required to, file a response to the newly asserted facts as well. (Doc. No. 107 at 2.) The court denied the motion. (Doc. No. 109.)

"Invasix (and not InMode) defended both suits and, ultimately, settled the claims asserted by the Texas Claimants in late November 2015 and January 2016, respectively." (*Id.* at 16 ¶ 5.) Again, "[i]n March 2017 and October 2018, Invasix (and not InMode) claimed it had authority to settle and, in fact, resolved (pre-suit) identical product liability (and other) claims asserted by two additional women injured by the Fractora procedure and represented by" the same counsel. (*Id.* at 18 ¶ 16.)

Jones' counsel also engaged in settlement negotiations regarding Jones' own claims beginning in October 2018, and "Invasix did not disclose [during those] settlement discussions with [Jones'] counsel that it no longer assumed responsibility for manufacturing of the device and/or that [Jones] was mistaken as to the identity of the manufacturer." (*Id.* at 19 ¶ 22.) Instead, Jones and her counsel first learned that Invasix would deny having manufactured the device and claim instead merely that it marketed the device for InMode in the reply brief filed by Invasix in Support of its Motion to Sever and Transfer on July 15, 2019. (*Id.* at 19 ¶ 23.) On July 25, 2019, Jones' attorney "inquired of defense counsel whether Invasix, in fact, [had] changed its position and, in this litigation, denie[d] manufacturing the product." (*Id.* at 19 ¶ 24.) When Invasix "failed to timely answer this inquiry," Jones sought and received permission to amend her complaint to add InMode as a party. (*Id.* at 19 ¶ 25.)

## II. LEGAL STANDARD

### A. Motion for Summary Judgment

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the

10

plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249, 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

**B. Objection to Material Cited in Support of Motion for Summary Judgment**

A party seeking summary judgment must support its asserted undisputed facts by citation to "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). Although the material cited is required only to be "in the record" and is not required, by Rule 56, to be provided in the admissible form anticipated for use at trial, a party opposing the summary judgment motion may "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(1).

A summary judgment movant facing an objection on admissibility grounds can overcome that objection by "explain[ing] the admissible form that is anticipated" for presenting the relevant

fact at trial. *Mangum v. Repp*, 674 F. App'x 531, 536 (6th Cir. 2017) (quoting Fed. R. Civ. P. 56(c), advisory committee's note to 2010 amendment); *see also Mount Vernon Fire Ins. Co. v. Liem Constr., Inc.*, No. 3:16-CV-00689, 2017 WL 1489082, at *3 (M.D. Tenn. April 26, 2017) (Crenshaw, J.) (acknowledging that the court, on a summary judgment motion, may consider evidence presented in hearsay form if the evidence can be reduced to admissible form at trial); *Wilson v. Stein Mart, Inc.*, No. 3:15-CV-01271, 2016 WL 4680008, at *2 (M.D. Tenn. Sept. 7, 2016) (Nixon, S.J.) (same); Jeffrey W. Stempel et al., 11-56 Moore's Federal Practice - Civil § 56.91 (2018) ("Although the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible . . . , the material may be presented in a form that would not, in itself, be admissible at trial.").

### III. ANALYSIS

#### A. Choice of law Regarding Statute of Limitations

##### 1. Applicable Choice-of-Law Test

Typically, when a federal court hears a diversity action, "the law of the forum state, including the choice-of-law rules, appl[ies]." *Montgomery v. Wyeth*, 580 F.3d 455, 459 (6th Cir. 2009) (citing *Uhl v. Komatsu Forklift Co.*, 512 F.3d 294, 302 (6th Cir. 2008)). Under Tennessee's choice-of-law principles, "statutes of limitations constitute procedural matters," meaning that the law of the forum state—that is, Tennessee—governs. *SunTrust Bank v. Ritter*, No. E2017-01045-COA-R3-CV, 2018 WL 674000, at *4 (Tenn. Ct. App. Feb. 1, 2018). Under that relatively straightforward rule, this court would typically apply the relevant Tennessee statute of limitations to a cause of action brought in this district pursuant to the court's diversity jurisdiction (presuming, of course, that there was no federal law to the contrary).

Jones, however, draws the court's attention to a different, more specific principle: that, "when a diversity case is transferred from one federal district court to another, substantive law governing the jurisdiction of the transferor court controls." *Wahl v. Gen. Elec. Co.*, 786 F.3d 491, 494 (6th Cir. 2015). The Supreme Court, citing the interests of justice, adopted that rule in order to prevent the 28 U.S.C. § 1404(a) transfer process—which exists merely to further the interests of convenience—to result in any "a prejudicial change of [the] law" governing the transferred case. *Van Dusen v. Barrack*, 376 U.S. 612, 625 (1964). In so doing, the Supreme Court specifically expressed its desire to propound a rule that would prevent a defendant from seeking a transfer in order to take advantage of a "shorter statute of limitations." *Id.* at 629. Jones accordingly argues that this court should treat her claims as governed by California choice-of-law principles and, ultimately, California's relevant statutes of limitations for the underlying causes of action, which range from two to four years in length. *See* Cal. Com. Code § 2725 (express warranty, four years); Cal. Civ. Code 1791.1 (extending express warranty remedies to implied warranty); Cal. Bus. & Prof. Code § 17208 (unfair competition, four years); Cal. Civ. Proc. Code § 338(d) (fraud, three years); Cal. Civ. Proc. Code § 335.1 (personal injury from negligence, two years); *Aoki v. Gilbert*, No. 2:11-CV-02797-TLN-CK, 2014 WL 3689345, at *11 (E.D. Cal. July 23, 2014) (false advertising, three or four years).

Although the defendants did not address the choice-of-law issue in their initial briefing in support of their Motion for Summary Judgment and, instead, merely asserted that Tennessee law applies, they concede, in their Reply, that Jones is correct that this case is governed by the rule applicable to transferred cases and that, therefore, the court must proceed pursuant to California choice-of-law principles. The defendants argue, however, that doing so simply calls on the court to take a longer path to the same destination, because California's choice-of-law principles

13

mandate the application of Tennessee's statute of limitations here, just as Tennessee's choice-of-law principles would, albeit for somewhat different reasons.[3]

In her Sur-Reply, Jones takes her argument a step further and argues that the rule that the law of the transferor court's state governs, in and of itself, dictates that the court apply the California statute of limitations. In other words, Jones suggests that, because this case was transferred from California, this court must apply California law to the question of timeliness, regardless of whether a California-based federal court itself would have done so. (*See* Doc. No. 115 at 3 (arguing that, because this case is governed by the precedents governing transferred cases, the court is not required "to undertake a choice of law analysis").) This reading of the caselaw is mistaken. The court's duty is to apply California law in the same manner that the transferor court would have applied it, had no transfer taken place. That includes, if appropriate, following California choice-of-law principles, even if they tell the court to follow some non-California state's laws. *See Ferens v. John Deere Co.*, 494 U.S. 516, 519 (1990) ("[F]ollowing a transfer under § 1404(a) initiated by a defendant, the transferee court must follow the choice-of-law rules that prevailed in the transferor court."). By doing so, the court prevents the transfer from affecting which state's law will apply. If the court cited the transfer to sidestep, rather than apply, the transferor court's choice-of-law rules, it would directly contradict the purpose of the rule.

Unlike Tennessee courts, "California courts do not use th[e] traditional approach"—that is, the substantive/procedural distinction—when deciding which state's law to follow on "statute of limitations issues." *ABF Capital Corp. v. Costello & Lanahan*, No. A106590, 2005 WL 3514288,

---

[3] Although Jones argues that the defendants have invoked this argument too late and have therefore forfeited it, the defendants have consistently asserted that Tennessee statutes of limitations apply. The somewhat more complicated argument that the defendants now raise is merely alternative support for a legal assertion that the defendants had already made in a timely manner. The court, accordingly, finds no waiver or forfeiture and must consider which state's timeliness requirements apply under California choice-of-law rules.

14

at *9 (Cal. Ct. App. Dec. 23, 2005); *accord McCann v. Foster Wheeler LLC*, 225 P.3d 516, 527 (Cal. 2010) ("[T]he earlier methodology for resolving choice-of-law issues has been replaced in this state by the governmental interest mode of analysis.") Instead, "California conflict of laws principles treat the statute of limitations in the same manner as any other issue, and the courts of th[e] state do not automatically apply California's statutes of limitations in every case." *Hambrecht & Quist Venture Partners v. Am. Med. Int'l, Inc.*, 46 Cal. Rptr. 2d 33, 39 (Cal. Ct. App. 1995). Those general principles call on the court to take a "governmental interest approach" that requires the court to resolve conflicts between states' laws by "'carefully evaluat[ing] and compar[ing]the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state.'" *McCann*, 225 P.3d at 527 (quoting *Kearney v. Salomon Smith Barney, Inc.*, 137 P.3d 914, 922 (Cal. 2006)).

Before applying that governmental interest approach, however, the court must make a threshold inquiry. California, like many other states, has legislatively adopted a "borrowing statute" that governs some, but not all, disputes with connections to other states. Pursuant to that statute,

> [w]hen a cause of action has arisen in another State, or in a foreign country, and by the laws thereof an action thereon cannot there be maintained against a person by reason of the lapse of time, an action thereon shall not be maintained against him in this State, except in favor of one who has been a citizen of this State, and who has held the cause of action from the time it accrued.

Cal. Civ. Proc. Code § 361. Only after the court determines that the borrowing statute "does not *require* application" of another state's statute of limitations should the court move on to "consideration of California's generally applicable choice-of-law principles," which may favor California law or may favor the law of the other state. *McCann*, 225 P.3d at 526.

15

In summary, then, the court's choice-of-law analysis in this case has three potential steps. The first step was to determine which state's choice-of-law rules apply. The parties agree that California's do, because this case was transferred from California. The second step, which is mandated by California statutory law, is to determine whether the borrowing statute applies to any particular cause of action. If the borrowing statute does apply, then the inquiry is over, and the court must apply the statute of limitations of the relevant non-California state (here, Tennessee). Finally, as the potential third step, which only arises if the borrowing statute does not apply, the court turns to California common law, which requires the court to determine which state's governmental interest in its cause of action predominates. Whichever state's governmental interest is stronger will, for a cause of action that falls outside the borrowing statute, provide the applicable statute of limitations.

## 2. Applicability of the Borrowing Statute

"By its terms[,] section 361 applies whenever a cause of action arises in [a state other than California] and would be stale in that state, unless the holder of the cause of action is a California citizen who has held the cause from the time of accrual." *Giest v. Sequoia Ventures, Inc.*, 83 Cal. App. 4th 300, 303 (2000) (emphasis omitted). Jones is not a citizen of California. The applicability of the borrowing statute therefore depends on whether Jones' causes of action arose in Tennessee. "Section 361," unfortunately, "does not define the term 'has arisen,'" and the caselaw applying the term often speaks in a high level of generality. *Zacher v. Robinson Helicopter Co., Inc.*, No. B279673, 2017 WL 6333908, at *3 (Cal. Ct. App. Dec. 12, 2017). Most courts have embraced a general rule that, for the purposes of the California borrowing statute, "a tort cause of action arises when the wrongful act is committed, even though damages resulting from the tort w[ere] not sustained at that time, and even though the plaintiff may not know that a tort has been committed."

16

*Dalkilic v. Titan Corp.*, 516 F. Supp. 2d 1177, 1184–85 (S.D. Cal. 2007) (citing *Rash v. Bomatic, Inc.*, 2005 WL 503929, *7 (Cal. App. 4 Dist. Mar. 4, 2005)); *accord Stremcha v. Allscripts, Inc.*, No. SA CV 16-2057-DOC (JCGx), 2017 WL 10574371, at *7 (C.D. Cal. Nov. 8, 2017); *but see Stremcha*, 2017 WL 10574371, at *7 (C.D. Cal. Nov. 8, 2017) (observing that some "federal courts applying California's borrowing statute have determined that a tort action 'arises' where the injury occurs") (citing *ChinaCast Educ. Corp. v. Chen Zhou Guo*, No. CV 15-05475-AB (Ex), 2016 WL 6645792, at *4 (C.D. Cal. June 3, 2016), *rev'd*, 727 F. App'x 394, 395 (9th Cir. 2018)). That general rule, though, is not absolute, and the unique features of a particular cause of action may call for an outcome other than the one that would be yielded merely by mechanically identifying the site of the defendant's wrongdoing. *See Zacher*, 2017 WL 6333908, at *3 ("While it is true that in some cases a tort cause of action arises when the wrongful act is committed even though no damages were sustained until later, a wrongful death cause of action is not a typical tort cause of action."). Accordingly, a court "must determine under § 361 when (and where) a cause of action has arisen for each applicable claim asserted" and determine the applicability of the borrowing statute accordingly. *Dalkilic*, 516 F. Supp. 2d at 1185 (internal quotation marks omitted).

The Second Amended Complaint includes seven causes of action. In an attempt to address this already-complicated issue as efficiently as possible, the court will include the causes of action and their elements[4] in the table below:

---

[4] The plaintiffs have not clearly stated which state's laws they seek to rely on for their common law causes of action. Because the plaintiffs have asserted California statutory causes of action, the court will rely on the elements set forth in California law, without prejudice to any determination regarding which state's substantive law should govern the elements of any underlying claim itself. The court, however, is not aware of any relevant differences between the California causes of action and equivalent Tennessee causes of action.

|   | Cause of Action | Elements[5] |
|---|---|---|
| 1 | Breach of express warranty | " (1) [T]he seller's statements constitute an affirmation of fact or promise or a description of the goods; (2) the statement was part of the basis of the bargain; and (3) the warranty was breached." *Weinstat v. Dentsply Internat., Inc.*, 103 Cal. Rptr. 3d 614, 626 (Cal. Ct. App. 2010). |
| 2 | Breach of implied warranty | "1. There was a sale of goods; the defendant was the seller, and plaintiff a buyer[.] 2. Defendant [impliedly] warranted the goods sold[.] 3. There was a breach of warranty[.] 4. The breach of warranty caused plaintiff to suffer injury, damage, loss or harm[.] 5. The plaintiff gave defendant timely notice of the breach of warranty." *Scott v. Metabolife Int'l, Inc.*, 9 Cal. Rptr. 3d 242, 250 (Cal. Ct. App. 2004). |
| 3 | California Unfair Competition Statute, Cal. Bus. & Prof. Code § 17200 *et seq.* | The plaintiff "has suffered injury in fact and has lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204. |
| 4 | California False Advertising Law, Cal. Bus. & Prof. Code § 17500 *et seq.* | The plaintiff "has suffered injury in fact and has lost money or property as a result of a violation of this chapter." Cal. Bus. & Prof. Code § 17535. |
| 5 | Common law fraud | "(a) [A] misrepresentation (false representation, concealment, or nondisclosure); (b) scienter or knowledge of its falsity; (c) intent to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Hinesley v. Oakshade Town Ctr.*, 37 Cal. Rptr. 3d 364, 367 (Cal. Ct. App. 2005). |
| 6 | Negligence | "[D]uty, breach, causation, and damages." *Johnson v. Prasad*, 168 Cal. Rptr. 3d 196, 199 (2014). |
| 7 | Strict Liability | "[A] defect in the manufacture or design of the product or a failure to warn, causation, and injury." *Nelson v. Superior Court*, 50 Cal. Rptr. 3d 684, 687 (Cal. App. 2006). |

Each cause of action has at least some connection to Tennessee, given that Tennessee is where Jones' injury occurred. Under the aforementioned California caselaw, however, the site of the injury is not necessarily where the cause of action "arose"—although it may be. The court, accordingly, will look more closely at the causes of action themselves to determine whether they actually arose in Tennessee or in another state.

---

[5] Internal quotation marks, citations, and some internal formatting omitted.

18

Although each claim differs from the others, the claims can be roughly divided into three

classes. First are the claims—the court will call them the "Fraud/Warranty Claims"—that are based

on alleged misrepresentations about the Fractora made directly and specifically to Jones and/or the

clinic that performed Jones' procedure—that is, Counts 1, 2, and 5. The second category of claims,

which the court will refer to as the "Marketing/Advertising Claims," are those based on the general

marketing and advertising of the Fractora device and procedure, which was not directed

specifically at any single person or clinic but which may have influenced Jones or her clinic in the

decision to give her the damaging procedure. That category encompasses Counts 3 and 4. Finally,

Counts 6 and 7 look to the design of the Fractora itself, under a product liability paradigm. The

court will call this last category the "Product Claims."

Based on the court's review of the Second Amended Complaint and the available caselaw,

the court concludes that the Fraud/Warranty claims arose in Tennessee for the purposes of the

borrowing statute. Regardless of where Invasix (or, for that matter, InMode) was based, these

claims arise out of a particular transaction involving a particular Fractora device to be used at one

Tennessee clinic. Any fraud or giving of a false warranty involved that purchase and that use.[6] The

court, accordingly, concludes that the borrowing statute applies to Counts 1, 2, and 5.

With regard to the Product Claims, at least, there is some relevant caselaw. The California

Court of Appeal has held, at least once, that, where a product—in that instance, asbestos—injured

a person, the cause of action arose in the state of injury for the purposes of the borrowing statute.

*See Cossman v. DaimlerChrysler Corp.*, 133 Cal. Rptr. 2d 376, 380 (Cal. App. 2003), *as modified*

(Apr. 30, 2003) (holding that borrowing statute applied to require application of Indiana statute of

---

[6] The court notes that an argument could be made that at least some warranty-based claims should be
governed by California's principles for applying the borrowing statute to breach of contract actions. Jones,
however, has not alleged any contractual relationship between her and the defendants.

19

limitations for claims arising out of asbestos exposure in Indiana). Similarly, the Central District of California has held that a cause of action against the manufacturer of an allegedly harmful medical implant arose where the device was implanted and used. *See Vestal v. Shiley Inc.*, No. SACV96-1205-GLT(EEX), 1997 WL 910373, at *2 (C.D. Cal. Nov. 17, 1997). The Seventh Circuit—applying California choice-of-law rules following a transfer—found that, where Taiwanese citizens were harmed by blood infusions performed in Taiwan with blood that had been improperly processed in California, the borrowing statute applied to borrow the Taiwanese statute of repose. *See Chang v. Baxter Healthcare Corp.*, 599 F.3d 728, 733 (7th Cir. 2010). The pattern appears to be that, when a cause of action is based on the plaintiff's use of a faulty product in his home jurisdiction, that home jurisdiction's statute of limitations or repose applies under the borrowing statute. The court will follow that trend with regard to these causes of action and apply the Tennessee statute of limitations.

The Marketing/Advertising Claims present the most difficult case. Jones argues that, although the record is not yet sufficient to allow the court to know, for sure, whether the defendants directed their marketing and advertising from Invasix's California office, it appears clear that those activities were not directed out of Tennessee. Jones argues that, applying the general California rule that a cause of action arose, for borrowing statute purposes, where the underlying wrongdoing occurred, the court should hold that the claims arose in whatever jurisdiction was home to the relevant corporate decisionmakers.

On the other hand, while the underlying marketing and advertising may have been directed from another jurisdiction and targeted broadly at a wide population of potential consumers, Jones' causes of action do not arise out of some general grievance that the defendants advertised and marketed inappropriately. That general wrongdoing, if performed in California, would be the basis

20

for a California-based enforcement action by the California state government or a California local government, not a Tennessee-based private cause of action by an individual. *See* Cal. Bus. & Prof. Code § 17204 (authorizing action based on violation of California unfair competition statute by "the Attorney General or a district attorney or," in select situations, other government officials); Cal. Bus. & Prof. Code § 17535 (same with regard to violations of the California false advertising statute). Indeed, if any jurisdiction gave Jones a cause of action arising merely out of the defendants' general wrongdoing, that cause of action would be outside this court's jurisdiction, due to lack of a particularized injury. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016). For Jones' cause of action to arise, it had to have some connection to *her*.

Jones' individual claims, therefore, arose out of the particular instances of advertising and marketing that influenced, or at least potentially influenced, the ultimate use of the Fractora device on Jones herself. There was no cause of action related to advertising or marketing specific to Jones until, at the earliest, when Jones first became a Fractora patient. That happened in Tennessee. Indeed, at least some of the relevant marketing and advertising efforts themselves appear to have extended into Tennessee in a very literal sense, through the Fractora training and materials provided by Invasix to Dr. Goco's clinic. On balance, the court would likely conclude that the Marketing/Advertising Claims, like the other claims, arose in Tennessee, given the importance of distinguishing between mere *violations* of the relevant statutes and individual *claims* under those statutes. The issue, however, is close.

### 3. Alternative Governmental Interest Analysis

Ultimately, however, the court does not need to resolve whether the borrowing statute would require the court to apply the Tennessee statute of limitations to the Marketing/Advertising Claims, because the court concludes that, even if that statute does not apply, Tennessee's statute

of limitations should apply under the governmental interests analysis that pertains to other statute of limitations choice-of-law issues in California. The court, frankly, has its doubts regarding whether California's approach of weighing governmental interests can be performed with any kind of precision or predictability, and the court's review of California caselaw has not shown to the contrary. Ultimately, however, it is up to California courts and lawmakers to determine that state's approach, and this court's responsibility is merely to apply that approach as faithfully as possible. Doing so, the court concludes that Tennessee's shorter statute of limitations reflects its governmental interest in making the state a hospitable environment for companies to sell their medical products and in which those companies will be able to operate with a relative degree of certainty that they will be unlikely to face unexpected litigation based on old injuries. This government interest, the court holds, outweighs any California interest in allowing plaintiffs to wait an extra year after their injuries became apparent in order to sue.

The Fractora device at issue in this case was purchased for use in Tennessee. The procedure was performed in Tennessee, by a Tennessee practitioner, on a Tennessee patient who was injured. At stake, ultimately, is the amount of liability risk that a medical device company bears when it extends its market into Tennessee. California's interest in making its own manufacturers subject to greater liability is, while real, more attenuated. The state of California is entirely capable of protecting its own patients and of regulating its own medical device companies, regardless of what statute of limitations applies to Tennessee-based claims.

It is neither this court's place—nor, under California's own laws, the State of California's place—to second-guess Tennessee's decision that, on balance, the state is better served by a shorter statute of limitations that comparatively favors manufacturers and sellers. Indeed, the court holds that the same governmental interests analysis would apply to all of Jones' claims, even if the

22

borrowing statute did not mandate applying Tennessee law. The statute of limitations for all of Jones' claims is, therefore, the relevant Tennessee statute of limitations.

## B. Applicable Statutes of Limitations

In Tennessee, an "action[] for . . . injuries to the person" must be "commenced within one (1) year after the cause of action accrued." Tenn. Code Ann. § 28-3-104(a)(1)(A). That provision expressly applies to personal injury actions based on a theory of product liability, which "shall accrue on the date of the personal injury, not the date of the negligence or the sale of a product." Tenn. Code Ann. § 28-3-104(b)(1). The defendants argue that, if Tennessee law applies, then the one-year statute of limitations applies to all of Jones' claims. Jones does not suggest any substantive reason why any other Tennessee statute of limitation would apply to her claims other than her claims based on unfair competition and false advertising. (Doc. No. 104 at 17 (conceding that "Plaintiff's other claims for breach of express and implied warranty, common law fraud, negligence, negligence per se and gross negligence and strict product liability claims arguably fall under that statute of limitations"). She argues, however, that her unfair competition and false advertising claims should not be subject to the same one-year period, because they are not fundamentally about the flaws in the underlying Fractora product, but, rather, the actions of defendants' personnel.

Jones is misreading Tenn. Code Ann. § 28-3-104. The one-year statute of limitations for product liability actions addressed in Tenn. Code Ann. § 28-3-104(b)(1) does not, in any way, suggest that the one-year statute of limitations set forth in Tenn. Code Ann. § 28-3-104(a)(1)(A) applies only if a plaintiff relies on a product liability theory of recovery. Quite to the contrary, Tenn. Code Ann. § 28-3-104(a)(1) provides a substantial list of causes of action subject to the one-year limitation, many of which have nothing to do with products liability. Tenn. Code Ann. § 28-

23

3-104(b)(1) simply provides some extra detail regarding how that limitation should be applied in product liability cases. Tenn. Code Ann. § 28-3-104(a)(1)(A), however, applies to causes of action based on injury to the person, whether they are product liability-based or not, unless, of course, some more specific Tennessee statute sets a different limit.

If there is any question whether a particular cause of action is for injury to the person, the court "must identify the gravamen of each claim alleged" in order "to determine" whether Tenn. Code Ann. § 28-3-104(a)(1)(A) applies. *Benz-Elliott v. Barrett Enterprises, LP*, 456 S.W.3d 140, 141 (Tenn. 2015). "Identifying the gravamen of a claim requires a court to consider both the legal basis of the claim and the injury for which damages are sought." *Id.* In the Second Amended Complaint, Jones asserts that the defendants' wrongdoing underlying the unfair competition and false advertising claims was the "proximate cause of [her] injuries." (Doc. No. 87 ¶¶ 97, 104.) While Jones may have had some purely economic injuries, in the form of paying for the Fractora procedure, the gravamen of her case is plainly for her physical disfigurement. The court will, accordingly, apply the one-year statute of limitations to all of her claims.

## C. Objections/Motion to Strike

Before the court can finally turn to applying the relevant statute of limitations, it must address the evidentiary issue that Jones has raised. Jones objects to the defendants' "use of superseded pleadings and Federal Rule of Evidence 408 settlement communications, all for the purpose of impeaching" Jones regarding her claims of when she realized she had been injured by the arguable wrongdoing of the defendants. (Doc. No. 101 at 2.) Jones also argues that, insofar as her prior pleadings are otherwise admissible, they are hearsay. The defendants respond, first, that Jones has overstated their reliance on the challenged materials and that, even if some contents of the demand packet might be inadmissible for the purposes of establishing liability, the packet

included other, admissible materials, like medical records. The defendants also argue that the prior complaints are admissible because the statements in those complaints are attributable to Jones herself, and the out-of-court statements by a party opponent are not hearsay pursuant to Rule 801(d)(2)(A) and/or (C).

The defendants are correct that Jones is, to some degree, missing the forest for the trees when it comes to Rule 56. The fundamental basis of a Rule 56 motion is not evidence *qua* evidence. Evidence is an issue for trial. Rule 56 motions are about *facts*—specifically, facts, supported by citation to the record, that the court is permitted, by the Rules of Civil Procedure, to treat as undisputed, either because the parties actually agree on those facts or because the party challenging the facts has not disputed them sufficiently to persuade a reasonable fact finder. An asserted undisputed material fact needs only to be (1) supported by citation to the record, Fed. R. Civ. P. 56(c)(1), and (2) capable of being presented at trial in some admissible form, Fed. R. Civ. P. 56(c)(1).

The relevant fact, here, is when Jones knew or should have known that she had been wrongfully injured. Jones has admitted to—and even, in many cases, set forth herself—the great bulk of details relevant to that question of fact. Jones, moreover, has not identified any basis for excluding her medical records, which would be admissible and subject to discovery entirely aside from her settlement demand. Jones has not identified any basis for treating the admissibility of the prior pleadings or the demand letter itself as determinative of any question on which the defendants' motion will depend. Because Jones' objections do not challenge the ultimate supportability of any fact necessary to the defendants' argument, those objections are overruled, and her request to strike the relevant documents will be denied. Whatever evidentiary issues might exist at trial, Jones has not identified a basis for forgoing consideration of the underlying facts

25

about her knowledge now. The court, therefore, will consider the defendants' motion based on the cited materials in the record, while noting that the court's analysis is not premised on any conclusion about the admissibility of the demand letter itself or the assumption that Jones' Complaints can, as a factual matter, be treated as Jones' own utterances for hearsay purposes.[7]

## D. Application of One-Year Statute of Limitations

Jones entered into her Tolling Agreement on January 23, 2019. The procedure that caused her injury was performed more than a year earlier, on November 15, 2017. The defendants urge the court to treat those facts as dispositive and hold that her claims are untimely. Tennessee, however, does not assume that every statute of limitations begins to run on the date of the plaintiff's injury. For most causes of action, Tennessee applies the discovery rule, which, as this court has already noted, provides that a cause of action only accrues "when the plaintiff knows or in the exercise of reasonable care and diligence should know that an injury has been sustained as a result of wrongful or tortious conduct by the defendant." *John Kohl & Co.*, 977 S.W.2d at 532. In other words, the plaintiff must have suffered "legally cognizable damage—an actual injury," and she "must have known or in the exercise of reasonable diligence should have known that this injury was caused by the defendant's wrongful or negligent conduct." *Id.* (citation omitted).

As the Tennessee Supreme Court has explained:

> An actual injury occurs when there is the loss of a legal right, remedy or interest, or the imposition of a liability. An actual injury may also take the form of the plaintiff being forced to take some action or otherwise suffer some actual inconvenience, such as incurring an expense, as a result of the defendant's negligent or wrongful act . . . . However, the injury element is not met if it . . . amounts to a mere possibility.

---

[7] The question of whether the superseded Complaints can be factually established to be Jones' own utterances is, of course, distinct from the question of whether they can be attributed to her, as a legal matter, in the context of, for example, a motion for a litigation sanction such as an adverse presumption.

*Id.* (citations omitted). Under the discovery rule, the statute of limitations begins to run, at the latest, when the plaintiff becomes aware that such an injury has been done to her. As the Tennessee Supreme Court explained, however, "[u]nder the theory of constructive knowledge, . . . the statute may begin to run at an earlier date—whenever the plaintiff becomes aware or reasonably should have become aware of facts sufficient to put a reasonable person on notice that an injury has been sustained as a result of the defendant's negligent or wrongful conduct." *Id.*

The plaintiff's knowledge or constructive knowledge, moreover, need not entail a complete understanding of the severity or legal significance of the situation:

> [T]here is no requirement that the plaintiff actually know the specific type of legal claim he or she has, or that the injury constituted a breach of the appropriate legal standard. Rather, the plaintiff is deemed to have discovered the right of action if he is aware of facts sufficient to put a reasonable person on notice that he has suffered an injury *as a result of wrongful conduct.*

*Id.* at 533 (emphasis added). Accordingly, in this case, it is immaterial when Jones knew or should have known how severe her injuries were or that the defendants violated any specific legal prohibition; what matters is when she knew or should have known that some wrongful injury had occurred.

The defendants point to facts from Jones' post-injury period suggesting that she should have known—and, indeed, did know—that something had gone significantly wrong immediately or almost immediately. Specifically, they note that, after the procedure, Jones had to take three days off of work, which she had not needed to do following earlier Fractora procedures. The defendants also point out that, within two months of the procedure, Jones had already (1) been told by Wanda Cummings, a Fractora trainer, that her injuries had been caused by the use of the 60-pin tip and (2) sought and received a corrective medical treatment from Dr. Curcio. Specifically, Dr. Curcio discussed the corrective procedures with Jones on January 8, 2018, Jones paid for the

27

procedures around January 19, 2018 (Doc. No. 105 ¶¶ 26–27, at 21 ¶ 32), and Cummings told Jones that she should not have used the 60-pin tip at least on or before January 17, 2018. (*Id.* ¶ 15.)

As the court observed when considering the defendants' motions to dismiss, applying the discovery rule to an injury caused by a medical procedure or treatment is often difficult, because medical intervention can involve significant pain and suffering, regardless of whether any wrongful injury occurred. *See*, *e.g.*, *Sherrill v. Souder*, 325 S.W.3d 584, 594 (Tenn. 2010) (applying discovery rule to medication side effects); *Shadrick v. Coker*, 963 S.W.2d 726, 737 (Tenn. 1998) (applying discovery rule to effects of surgical screws); *Stanbury v. Bacardi*, 953 S.W.2d 671, 677 (Tenn. 1997) (applying discovery rule to results of foot surgery); *see also Cates v. Stryker Corp.*, No. 3:10-CV-546, 2012 WL 256199, at *3 (E.D. Tenn. Jan. 27, 2012) (applying discovery rule to effects of implanted pain pump). Nevertheless, Tennessee courts have consistently recognized that the line must be drawn somewhere.

In *Sherrill v. Souder*, for example, the Tennessee Supreme Court held that, even if a plaintiff does not yet have knowledge of the defendant's wrongful conduct, the statute of limitations period begins when she becomes "aware of facts sufficient to place a reasonable person on notice that her [injury] was the result of the Defendants' actions such that she could have discovered the breach of the standard of care through reasonable care and diligence." *Sherrill*, 325 S.W.3d at 596. In that case, the plaintiff had developed a symptom—specifically, tardive dyskinesia—as the result of medication that she had been prescribed. The Tennessee Supreme Court held that the statute of limitations for suing the prescriber began as soon as she knew that that injury was the result of the medication—even if she did not yet have any actual knowledge that the medication was improperly prescribed or that she had been improperly overseen as a patient following the prescription. *Id.* at 598.

Jones' position is somewhat similar to that of the plaintiff in *Sherrill*. There is no dispute that Jones knew, immediately, that the undesired effects she was experiencing were the result of her Fractora procedure. Under Tennessee law, therefore, she was immediately chargeable with all of the knowledge that she could then have obtained by performing reasonable inquiries regarding whether the injuries were wrongful. Accordingly, the determinative question is not merely what Jones learned or was told in the immediate aftermath of her procedure, but what she *could have learned* if she had done a reasonable investigation. By the same principle, as Jones gained more information, she became chargeable with knowledge of everything that she could or should have learned from making reasonable inquiries in response to that new information.

From that perspective, three facts, in particular, stand out. First is merely the admitted and self-evident severity of her reaction to the Fractora procedure, resulting in immediate scabbing and the need to miss multiple days of work. Second is Jones' having been informed, by Cummings, that her injury was caused by the 60-pin tip and that the aesthetician who performed the procedure on Jones, in Cummings' view, should not have used that tip. Jones stresses that, although Cummings blamed the 60-pin tip, Cummings did not suggest that the defendants had acted wrongfully. Jones, however, has not provided any reason to doubt that further investigation about the tip could have, at that point, revealed her potential claim. Indeed, as Jones herself points out, a number of claims had already been raised against Invasix regarding harm done by the Fractora device well before Jones' injuries. Finally, any argument that Jones lacked a basis for knowing of her injury is strongly belied by the fact that she sought out and received corrective treatment more than a year before she entered into the tolling agreement. Even if she, at the time, did not know just how severe her injuries were or how difficult it would be to address them, she undeniably knew, at that point, that the Fractora procedure had caused her to expend additional effort and

29

money to take ameliorative steps. Such a situation is, to say the least, suggestive of a wrongful injury to the point that a thorough further investigation would have been reasonable.

A defendant's wrongdoing is not required, by the discovery rule, to be crystal clear; indeed, if that were the case, the statute of limitations for many claims would never begin running. In many cases, it remains reasonably debatable, until a verdict is reached, whether any wrongful injury occurred. In order for the discovery rule to function, then, it must be enough that the plaintiff was informed of facts that put her on reasonable inquiry notice of a colorable claim. The facts that Jones suffered unusual injuries that were immediately apparent, that a Fractora employee told her that her injuries were likely caused by the 60-pin tip, and that she was forced to take steps to ameliorate the injury were enough to put her on notice of the need for a meaningful inquiry into whether she had a colorable claim. Moreover, while the inquiries that she did perform may have been somewhat inconclusive, that fact, at most, would undermine the inference that she possessed actual, rather than merely constructive, knowledge. Actual knowledge, however, is not required for a cause of action to accrue in Tennessee.

To hold that the significant information available to Jones was insufficient to form the basis of constructive knowledge would be setting the bar for such a holding so high that this court would, in effect, be disregarding binding Tennessee precedent. The court, accordingly, holds that no reasonable factfinder could conclude that Jones' claims against Invasix accrued less than a year before the tolling period, and the court will grant summary judgment to Invasix with regard to all claims asserted against it.

**E. Fraudulent Concealment and the Claims Against InMode**

Jones argues, in the alternative, that, even if she should have sued Invasix sooner, her claims against InMode are timely because the defendants fraudulently concealed InMode's identity

as a potentially liable party, giving rise to Tennessee's doctrine of tolling based on fraudulent concealment. Under Tennessee law, a plaintiff is entitled to tolling of the statute of limitations if she can establish the following:

> (1) that the defendant affirmatively concealed the plaintiff's injury or the identity of the wrongdoer or failed to disclose material facts regarding the injury or the wrongdoer despite a duty to do so; (2) that the plaintiff could not have discovered the injury or the identity of the wrongdoer despite reasonable care and diligence; (3) that the defendant knew that the plaintiff had been injured and the identity of the wrongdoer; and (4) that the defendant concealed material information from the plaintiff by withholding information or making use of some device to mislead the plaintiff in order to exclude suspicion or prevent inquiry.

*Redwing v. Catholic Bishop for Diocese of Memphis*, 363 S.W.3d 436, 463 (Tenn. 2012) (internal footnotes and quotation marks omitted). Jones argues that Invasix concealed InMode's identity as a wrongdoer in this case by leading Jones' counsel to believe that Invasix was the manufacturer of the Fractora device and failing to disclose the actual identity of InMode.

Jones has asserted sufficient facts to avoid summary judgment on this issue. The defendants have produced nothing to refute Jones' telling of events—namely, that, over the course of several cases that resulted in settlement, Invasix led and allowed Jones' attorney to believe that Invasix was the manufacturer of the Fractora device, while Invasix had, all the while, in fact been aware that it was merely marketing a device made by another company. At most, the defendants have identified clues that might have led Jones to discover the importance of InMode, such as the name "InMode" appearing on product documentation and other materials. As Jones suggests, however, that name "InMode," as used in the United States, could have been—and indeed may actually have been—simply a d/b/a name of Invasix itself. The facts available at this stage would allow a reasonable factfinder to conclude that reasonable care and diligence would not have allowed Jones to discover that she was mistaken about the manufacturer of the Fractora device. The court, accordingly, will deny summary judgment with regard to the claims against InMode.

## **IV. CONCLUSION**

For the foregoing reasons, the defendants' Motion for Summary Judgment (Doc. No. 90) will be granted in part and denied in part, and Jones' Motion to Strike Summary Judgment Evidence and Objections (Doc. No. 101) will be denied. The court will grant Invasix summary judgment with regard to all claims and deny InMode summary judgment with regard to all claims.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge